UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

UNITED STATES OF AMERICA

              -against-

YANG KIM,
      also known as "Andrew Kim,"

                         Defendant.

**MEMORANDUM & ORDER**
16-CR-191 (PKC)

----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Defendant Yang Kim, also known as "Andrew Kim," has been charged in a two-count indictment with receipt and possession of child pornography, in violation of Title 18, United States Code, Sections 2252(a)(2) and 2252(a)(4)(B), respectively. These charges arose out of an investigation by the Federal Bureau of Investigation ("FBI") into a website known as "Playpen," which facilitated the accessing and sharing of child pornography by and between its users, allegedly including Kim. The website was only accessible via a network known as "Tor"[1], which anonymizes the user, in part, by concealing his or her Internet Protocol ("IP") address. As part of its investigation, the FBI took administrative control of, and for a two-week period managed, the

---

[1] "Tor" stands for "The Onion Router". *See United States v. Anzalone*, No. 15-10347, 2016 WL 6476939, at *1 (D. Mass. Oct. 28, 2016); *United States v. Levin*, 186 F. Supp.3d 26, 29 n.3 (D. Mass. 2016), *appeal docketed*, No. 16-1567 (1st Cir. May 20, 2016); Affidavit in Support of Application for a Search Warrant ("Macfarlane Aff."), 15-SW-89 (E.D.V.A. Feb. 20, 2015), attached as Ex. A to Government's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Govt. Mem.", Dkt. 31), Dkt. 31-1, ¶ 7.

operation of the Playpen website, in order to implant a Network Investigative Technique ("NIT") that enabled the FBI to identify the IP addresses of Playpen's users.[2]

Before the Court is Defendant's motion to dismiss the indictment. Defendant asserts that the government's two-week operation of the Playpen website constitutes "outrageous" governmental conduct that violates due process and warrants dismissal of the indictment in this matter. *See United States v. Russell*, 411 U.S. 423, 431–32 (1973) ("[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."). Applying the relevant legal standards and giving due deference to law enforcement decision-making, the Court does not find the government's conduct in connection with the Playpen website to be so outrageous as to warrant dismissal of the indictment. Accordingly, Defendant's motion is denied.

---

[2] On February 19, 2015, the FBI executed a court-authorized search of the Florida residence of the suspected Playpen website administrator. Instead of shutting down the website, on February 20, 2015, the FBI sought and obtained a search warrant in the Eastern District of Virginia authorizing the FBI to keep the website in operation and to deploy the NIT on it for 30 days ("NIT warrant"). The FBI administered and monitored the Playpen website between February 20 and March 4, 2015. *See* Govt. Mem. at 4; Defendant's Memorandum of Law ("Def. Mem."), Dkt. 29, at ECF 1. (Because Defendant's Memorandum of Law contains no page numbers, in referencing the memorandum, the Court uses the pagination generated by the court's Electronic Docket Filing System, which are denominated as "ECF" pages.)

## DISCUSSION[3]

### I. LEGAL STANDARDS

In *United States v. Al Kassar*, the Second Circuit explained that "[g]overnment involvement in a crime may in theory become so excessive that it violates due process and requires the dismissal of charges against a defendant even if the defendant was not entrapped." 660 F.3d 108, 121 (2d Cir. 2011) (citing *United States v. Rahman*, 189 F.3d 88, 131 (2d Cir. 1999); *Russell*, 411 U.S. at 431–32). "To establish a due process violation on this ground, a defendant must show that the government's conduct is 'so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.'" *Id.* (quoting *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)); *see also United States v. LaPorta*, 46 F.3d 152, 160 (2d Cir. 1994) (government action must "reach a demonstrable level of outrageousness before it could bar conviction") (internal quotation marks omitted). Because of the courts' "well-established deference to the Government's choice of investigatory methods", this is a "very heavy" burden. *United States v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011) (quoting *Rahman*, 189 F.3d at 131).

Traditionally, courts have only found a due process violation based on outrageous governmental conduct where the conduct is directed at the defendant. *See*, *e.g.*, *Rochin v. California*, 342 U.S. 165 (1952) (affirming dismissal of indictment based on government agents breaking down defendant's bedroom door, attempting to forcibly remove pills from his throat, and ordering his stomach to be pumped); *Al Kassar*, 660 F.3d at 121 ("Generally, to be 'outrageous,'

---

[3] The Court assumes the parties' familiarity with the facts relating to Defendant's motion, which are set forth in detail in the parties' submissions (*see* Def. Mem. at ECF 2–6; Govt. Mem. at 1-6), and which are largely not in dispute, with a few exceptions that the Court discusses as necessary.

the government's involvement in a crime must involve either coercion or a violation of the defendant's person."); *Rahman*, 189 F.3d at 131 ("paradigm examples of conscience-shocking conduct are egregious invasions of individual rights"). However, the Second Circuit in *United States v. Chin*, 934 F.2d 393 (2d Cir. 1991), suggested that the government's conduct could be deemed outrageous where it violates the rights of third parties, such as the victims of the crimes being investigated.

In *Chin*, a United States Postal Inspector, posing as a collector of child pornography, encouraged the defendant to travel to Amsterdam and purchase child pornography, which the defendant did. Though rejecting the defendant's argument that the agent's conduct toward him, *i.e.*, the alleged "psychological manipulation" of the defendant, amounted to outrageous governmental conduct, *id.* at 398–99, the Second Circuit went on to analyze the defendant's due process claim from the perspective of the third-party victims of his crime:

> Our conclusion that [the inspector's] exploitation of Chin's trust did not violate Chin's due process rights does not end our analysis, however. One factor distinguishes this case from the usual undercover operation and, in our opinion, raises very serious concerns with respect to the rights of third parties-namely, the rights of the children Congress sought to protect in enacting the prohibitions on child pornography. Our concern is that, in contrast to the usual sting operation, in which the Government sets up a phony drug transaction or another sort of dummy crime, the government agent in this case encouraged Chin to go out and commit a *real* crime, with *real* victims, just so Chin could later be arrested and prosecuted.

*Id.* at 399.

The panel nonetheless found that, even though the inspector's encouragement of Chin resulted in Chin buying child pornography and thereby violating the rights of the child victims, this conduct was not so outrageous as to violate due process or warrant reversal of Chin's conviction. In reaching this conclusion, the panel stated: "A necessary prerequisite for demonstrating that an undercover investigation violated the rights of third parties is *proof* that the

4

governmental action actually caused the defendant to commit a crime *that would otherwise not have been committed*." *Id*. at 400 (emphasis added).[4] Finding that Chin could not make such a showing, the court denied his appeal on that ground. It also expressly declined to reach the issue of "whether the harm [Chin's] crime inflicted on third parties-specifically, the stimulation of demand for child pornography-is sufficient to constitute a due process violation under the principles set forth in [*United States v. Archer*, 486 F.2d 670 (2d Cir. 1973)]"[5]. *Id*. (finding no need to decide this issue "[b]ecause Chin cannot establish that government agents were responsible for his purchase and importation of illicit magazines").

---

[4] The *Chin* panel also took the "opportunity to caution law enforcement agents to think twice before engaging in investigative techniques that encourage individuals to commit actions that harm innocent third parties." *Id*. at 400–01 ("In the words of Judge [Henry] Friendly, '[p]rosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that they will assign too little to the rights of citizens to be free from government-induced criminality.'") (quoting *United States v. Archer*, 486 F.2d 670, 677 (2d Cir. 1973)).

[5] In *Archer*, the Second Circuit criticized the government's use of a federal agent to "assume the role of a potential consumer of corruption" as part of an investigation into corruption in the State judicial system. 486 F.2d at 672. Though not overturning the defendants' convictions based on the government's conduct, the panel, in a decision written by Judge Friendly, provided this response to the government's argument that its investigation had not infringed the defendants' or any third parties' rights:

> [T]he Government agents displayed an arrogant disregard for the sanctity of the state judicial and police processes. The investigators apparently permitted their deserved contempt for corrupt practitioners in the Queens criminal justice system to spill over into disdain for all the participants in the system-including the police, the courts, and the members of the grand jury, all of whom were subjected to the Government's fabrications. While this pattern of deception may be less serious than some forms of governmental participation in crime that can be hypothesized, it is substantially more offensive than the common cases where government agents induce the sale of narcotics in order to make drug arrests.

486 F.2d at 677.

## II. APPLICATION

With these legal principles in mind, the Court turns to Defendant's motion.[6] Defendant argues that the indictment charging him with downloading child pornography should be dismissed because the FBI engaged in outrageous conduct by operating the Playpen website for two weeks, which, Defendant claims, resulted in the distribution of "as many as 1,000,000" images and videos of child pornography. Def. Mem. at ECF 2, 5–6.[7] Relying on *Chin*, Defendant argues that by

---

[6] Defendant filed his motion on December 12, 2016. (Dkt. 29.) The government filed its opposition on January 6, 2017. (Dkt. 31.) The Court heard oral argument on January 13, 2017.

[7] The Court cannot gauge the accuracy of Defendant's estimate of 1,000,000 images and videos, which he bases on the "total of 1,000,000 logins" to the Playpen website during its operation by the FBI. (Def. Mem. at ECF 5–6 ("it would be fair to assume that visitors [to the Playpen website] downloaded or posted at least one picture or video during their visits"); *see* United States' Response to Order Compelling Discovery in *United States v. Michaud*, 15-cr-5351 (W.D.WA) ("*Michaud* Discovery Response"), attached as Ex. B to Def. Mem., at 4 (government providing figure of "approximately one million total logins" during the two-week period when FBI operated Playpen website).) By contrast, the government has only acknowledged that a minimum of 22,000 pictures, videos, and links to child pornography were distributed during the FBI's operation of the Playpen website. (Def. Mem. at ECF 5 (citing *Michaud* Discovery Response, Def. Mem., Ex. B, at 2–3).) According to the government, "it is not possible to give an exact total of child pornography images or videos viewed or downloaded by site users during that time period." (Def. Mem., Ex. B, at 3.) As the government explained in *Michaud* Discovery Response, the Playpen website "was an online bulletin board through which users provided the content of the site by posting messages and/or replies to messages within categories set up by the site administration . . . . [U]sers generally posted textual messages in which 'preview' images . . . were embedded, and that included a link to a URL, the address of a website or server at which the videos or images could be downloaded, along with any password necessary to download and decrypt the videos or images." *Id*. at 1–2. Thus, given how the website worked, it might, in fact, not be "fair to assume" that a Playpen user downloaded or posted an image or video—as opposed to simply communicating with other users—*every* time the user logged onto the site. Although images and videos made available by the Playpen website were generally only available for a limited time, the numbers of images and videos that the FBI was able to recover from the website during the two-week period that it operated under the FBI's control—9,000 images and 200 videos—suggests that the number of images and videos downloaded by Playpen users during that time span was less than 1,000,000. *Id*. at 2–3; *see also id.* (Playpen users posted 13,000 links on the website and clicked on 67,000 unique links during the two weeks). Here, the government has not offered any data or figures regarding activity on the Playpen website, nor does it dispute the activity estimated by

operating the website for those two weeks, the FBI itself "distributed" child pornography, thereby violating the rights of countless child victims, and that although the Second Circuit denied relief in *Chin*, a different result is warranted here because of the greater degree of harm to the child victims and the greater extent of the government's involvement in the charged criminal activity.[8] At oral argument, defense counsel distilled these arguments into a single contention: because the FBI could have successfully conducted its investigation without allowing the actual distribution of child pornography to occur, its decision to allow the website to remain fully functional caused unnecessary harm to child victims and thus constituted outrageous governmental conduct.

A. Courts That Have Considered This Issue Have Declined To Grant Dismissal

At the outset, the Court notes that it appears that all courts that have considered the same due process challenge based on the NIT warrant have declined to dismiss the indictments in those cases. *See United States v. Vortman*, No. 16-CR-210, 2016 WL 7324987, at *1 (N.D. Cal. Dec. 16, 2016); *United States v. Hammond*, No. 16-CR-102, 2016 WL 7157762, at *6 (N.D. Cal. Dec. 8, 2016); *United States v. Owens*, No. 16-CR-38, 2016 WL 7079617, at *5 (E.D. Wis. Dec. 5, 2016); *United States v. Tippens*, 16-CR-5110 (W.D. Wash. Nov. 30, 2016), attached as Ex. D to Govt. Mem.; *Anzalone*, 2016 WL 6476939, at *5; *United States v. Allain*, No. 15-CR-10251, 2016 WL 5660452, at *13 (D. Mass. Sept. 29, 2016); *United States v. Chase*, 15-CR-15 (RLV)

---

Defendant. In any event, because the Court's ruling regarding Defendant's motion is not based on the volume of child pornography that was distributed through the Playpen website during the two-week period, it need to resolve this factual question.

[8] Defendant variously frames this argument as: (1) the government engaged in illegal conduct by distributing child pornography, a crime that the government itself has long declared "heinous"; (2) the ends of the investigation cannot justify the means; and (3) the government violated its own investigative principles. (Def. Mem. at ECF 11–18.)

7

(W.D.N.C. Sept. 6, 2016), attached as Ex. E to Govt. Mem. Of these seven decisions, only one court found that the government's conduct was outrageous[9], and even then, did not dismiss the indictment, based on its analysis of the six factors identified by the Ninth Circuit in *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013).[10] *See Tippens*, 16-CR-5110 (Govt. Mem., Ex. D), at 9.[11] As discussed below, the Court finds the reasoning set forth in these decisions persuasive as it applies to Defendant's arguments here.

---

[9] The court's finding of outrageous governmental conduct in *Tippens* was based, in part, on the court's conclusion that the government had "re-victimized hundreds of children by keeping [the Playpen website] online." *Tippens*, 16-CR-5110 (RJB) (Govt. Mem., Ex. D), at 8.

[10] The six factors identified in *Black* for assessing whether the government's conduct is outrageous are: "(1) known criminal characteristics of the defendants; (2) individualized suspicion of the defendants; (3) the government's role in creating the crime of conviction; (4) the government's encouragement of the defendants to commit the offense conduct; (5) the nature of the government's participation in the offense conduct; and (6) the nature of the crime being pursued and necessity for the actions taken in light of the nature of the criminal enterprise at issue." *Black*, 733 F.3d at 303.

[11] The courts in *Allain*, *Hammond*, *Tippens*, and *Vortmann* also considered motions to suppress, and found that the NIT warrant exceeded the geographical limitations imposed by Fed. R. Crim. P. 41(b). *Allain*, 2016 WL 5660452, at **9–11; *Hammond*, 2016 WL 7157762, at **3–4; *Tippens*, 16-CR-5110 (Govt. Mem., Ex. D), at *13; *Vortmann*, 2016 WL 7324987, at *10. However, all of those courts still denied suppression, finding that the error in the search warrant was "technical", the defendants had failed to establish prejudice, and/or the good faith exception applied. *Allain*, 2016 WL 5660452, at *11; *Hammond*, 2016 WL 7157762, at *5; *Tippens*, 16-CR-5110 (RJB) (Govt. Mem., Ex. D), at **14–18; *Vortman*, 2016 WL 7324987, at *11. *But see Levin*, 186 F. Supp.3d at 37, 41 (finding NIT warrant void *ab initio* and good faith exception therefore inapplicable).

Notably, Rule 41 was recently amended to extend the geographical reach of search warrants that may be issued by magistrate judges in circumstances like those presented by the NIT warrant. *See* Fed.R.Crim.P. 41(b)(6) ("a magistrate judge with authority in any district *where activities related to a crime may have occurred* has authority to issue a warrant to use remote access to search electronic storage media and to seize or copy electronically stored information located within *or outside* that district if: . . . the district where the media or information is located has been concealed through technological means . . . ."). (emphasis added).

### B. The Government's Conduct Was Not Outrageous

As became clear at oral argument, Defendant's due process claim boils down to the contention that the government's conduct was outrageous because the FBI could have accomplished its investigative goals without allowing for the actual distribution of child pornography and the attendant harm to the child victims. This argument, however, ignores, or at least gives short shrift to, the "well-established" deference that is accorded to law enforcement in determining how to conduct its investigations. *Al Kassar*, 660 F.3d at 121. As the Second Circuit reminded us in *Al Kassar*, courts must give "deference to the Government's choice of investigatory methods", and thus the burden for proving outrageous governmental conduct is a "very heavy" one. *Id.* (quoting *Rahman*, 189 F.3d at 131). Thus, the standard for demonstrating "outrageous" governmental conduct is demanding for a reason. *See United States v. Bout*, 731 F.3d 233, 238 (2d Cir. 2013) (government's conduct must be "so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction.") (quoting *Schmidt*, 105 F.3d at 91); *Al Kassar*, 660 F.3d at 121 (same); *Rahman*, 189 F.3d at 121 (governmental conduct must shock the conscience).

The FBI's weighing of the costs and benefits of allowing the Playpen website to remain fully functional during the investigation is precisely the type of difficult decision-making that law enforcement must be allowed to make without undue second-guessing by the judiciary. The decision not to render Playpen, in effect, a dummy website during the investigation, as Defendant suggests (Def. Mem. at ECF 13–14), was one for the FBI, and not the Court or Defendant, to make. While it is clearly unfortunate and undesirable that the government's operation of the Playpen website allowed child pornography to continue to be accessed and shared, and for child victims

thereby to continue to be victimized, the Court does not find the government's conduct to be so outrageous as to violate due process. *See Bout*, 731 F.3d at 238. Here, the FBI did not post anything to the Playpen website, but simply let it continue to operate so that the NIT could be used to identify the website's users and other information that would assist the government in investigating and prosecuting them.[12] (*See Michaud* Discovery Response, Def. Mem., Ex. B, at 4–5.) The FBI continually assessed the efficacy and appropriateness of allowing the Playpen website to remain functional, and it ceased the operation as soon as it determined that the costs outweighed the benefits, which was within two weeks. (*Id*. at 4–7.) This was not a situation where the government acted recklessly or without regard for the consequences to the victims. (*Id*. at 6–7 (explaining the reasoning behind the "difficult decision" the government believed was "amply justified by the particular facts of the investigation".) Indeed, because of the investigation, the government, as of January 2015, had identified or recovered 26 child victims from abuse and charged at least 137 individuals in the United States, including 35 individuals who were determined to be "hands on" child sexual offenders and 17 individuals who were determined to be producers of child pornography. *Id*. at 7–8; *Anzalone*, 2016 WL 6476939, at *4 (noting that, as of October 2016, at least *49* children had been identified or rescued from abuse as a result of FBI's continued operation of Playpen website). Most significantly, the FBI's actions were court-authorized—hardly the hallmark of outrageous governmental conduct.[13]

---

[12] The NIT provided the government with seven items of information, including the activating computer's IP address, and the date and time that the NIT determined what that IP address was; the type of operating system running on the activating computer; the activating computer's host name; the activating computer's operating system username; and the activating computer's Media Access Control address. (Govt. Mem. at 4–5.)

[13] Defendant fails to address why the magistrate judge's approval and issuance of the NIT warrant does not substantially negate a finding of outrageous governmental conduct. At most, Defendant suggests that the issuing magistrate judge might have been misled or misinformed about

As noted, virtually all of the courts that have addressed the due process challenge to the Playpen investigation have reached the same conclusion. *See Vortman*, 2016 WL 7324987, at *6 (finding that "government's conduct did not rise to the level of outrageous conduct warranting dismissal of [defendant's] indictment"); *Hammond*, 2016 WL 7157762, at **5–6 ("While unsavory, the government's conduct did not rise to the level of outrageousness needed to support the dismissal of defendant's indictment.")[14]; *Owens*, 2016 WL 7079617, at **4–5 (holding that,

---

the volume of Playpen users and activity at the time the FBI applied for the NIT warrant, and thus was not fully aware of the potential harm to child victims if the website continued to operate. (Def. Mem. at ECF 3–4 (suggesting that, based on a comparison of the average number of unique users that visited the website weekly during the FBI's control, *i.e.*, 50,000, to the 11,000 average provided to the magistrate judge in the NIT warrant application, "the government either misrepresented to the EDVA magistrate judge[] or recklessly failed to appreciate the amount of harm it would cause by running the Playpen website"); *see Anzalone*, 2016 WL 6476939, at *4 (explaining seeming exponential increase in users after the FBI took control of the website as being caused by fewer users logging in during the early stages of the website, which dragged down the average number of users for the first seven months). Defendant's oblique and unsupported suggestion that the government may have knowingly misrepresented the number of Playpen users, however, does little to negate the significance of the NIT warrant in assessing the propriety of the government's conduct. It is clear from the search warrant application that the issuing magistrate judge was under no illusions about the potential impact or consequences of the warrant that the FBI was seeking. (*See*, *e.g.*, Macfarlane Aff. ¶¶ 11, 14 (describing website as containing 95,148 posts, 9,333 total topics, and having 158,094 total members, and listing categories of posts by topic and number), ¶ 19 (disclosing that 1,500 unique users visited the website daily, 11,000 unique users visited weekly, and 100 users made at least 100 posts, with 31 making at least 300 posts); ¶ 20 (noting private message feature that allowed users to communicate privately and noting site administrator's reference to a few hundred such "PMs"), ¶ 27 (identifying numerous sub-forums on the site that contained "the most egregious examples of child pornography and/or [were] dedicated to retellings of real world hands on sexual abuse of children."). In short, even assuming a four-fold discrepancy in the actual number of unique users visiting the Playpen website at the time the FBI applied for the NIT warrant and the number of users reported to the magistrate judge in the search warrant application, there simply is no basis to conclude that, in issuing the warrant, the magistrate judge was not fully aware of, or did not fully consider, the potential consequences of the FBI's operation of the website.

[14] The court in *Hammond* also indicated that it had considered the six factors set out in *Black* and that "the facts here do not meet the '*extremely high standard*' for dismissing an

without further guidance from the Supreme Court—which in *Rochin* found outrageous governmental conduct based on actions *directed at the defendant*—or the Seventh Circuit, "this Court is unwilling to find that the government's actions in this case were so outrageous as to justify dismissing the indictment against [defendant]."); *Anzalone*, 2016 WL 6476939, at *5 ("[Playpen] investigation . . . did not cross the line into outrageous conduct worthy of dismissal"); *Allain*, 2016 WL 5660452, at *13 ("government's conduct was not so outrageous as to warrant dismissal"); *see also Chase*, 15-CR-15 (Govt. Mem., Ex. E), at *2–3 (noting that no due process violation is established "merely by demonstrating 'somewhat offensive' or 'extremely unsavory' conduct on the part of the government" and finding that *Chin* and *Archer* do not support "reversal or dismissal of a conviction based solely on the harm to third parties as a result of the government's investigatory methods") (quoting *United States v. Osborne*, 935 F.2d 32, 36 (4th Cir. 1991).[15]

In *Anzalone*, the district court rejected the defendant's argument that the FBI's decision not to block access to Playpen's illicit content, despite having the means to do so, was outrageous. 2016 WL 6476939 at *4. The *Anzalone* court accepted the FBI's explanation that it maintained the website's full functionality because it "predicted that significant changes to the site would tip off Playpen's users, making it more difficult to find and arrest them." *Id*. In finding that the government's conduct was not outrageous, the court also relied on the fact that the FBI (1)

---

indictment for outrageous government conduct." *Hammond*, 2016 WL 7157762, at *6 (emphasis added) (citing *Black*, 773 F. 3d at 302).

[15] In *Chase*, the court ultimately denied the defendant's motion to dismiss the indictment based on the fact that all of the investigatory conduct at issue had occurred after the defendant's arrest, and "therefore, the FBI's operation of the [Playpen] website . . .[,] although arguably unsavory, neither assisted Defendant in allegedly committing the charged acts nor infringed upon any constitutional right belonging to the Defendant." *Chase*, 15-CR-15 (Govt. Mem., Ex. E), at *3.

regularly convened to assess the continued benefits of the investigation, (2) shut down the website as soon as it concluded that the costs outweighed the benefits, (3) continuously monitored postings to the website and took immediate action where it determined that a child was in imminent danger, and (4) identified or rescued 49 children who were being subjected to abuse. *Id*. The court concluded "[t]his is not emblematic of outrageous government conduct." *Id*.

Similarly, in *Allain*, the court, despite finding that "the government's investigation had disturbing consequences", recognized the deference owed to the government in conducting these investigations:

> Given the difficulty of identifying individuals that access child pornography online, the government['s] conduct was not so outrageous as to warrant dismissal. As child pornography migrates to the hidden corners of the web, the government will have to continue to make difficult choices about how to investigate and prosecute the related crimes. Reasonable minds will no doubt differ on whether the government made the right choice here, but it is not the rare case in which any misconduct on the part of the government was sufficiently blatant, outrageous, or egregious to warrant the dismissal of the indictment.

2016 WL 5660452, at *13. *See also Owens*, 2016 WL 7079617, at *5 ("[T]he Court does not purport to fully understand the complexity of child pornography investigations in today's technology filled world and does not lightly second guess the investigatory techniques of trained experts.")

In *Vortman*, the court found that the FBI's determination that allowing the Playpen website to remain fully operational during its investigation deserved deference:

> The difficulties law enforcement agents face in stopping and preventing [the production, distribution, and sale of child pornography] are exacerbated with the creation of technologies that can conceal a person's identity in the digital realm. Indeed, in seeking the NIT warrant the government testified [that] "investigative procedures that are usually employed in criminal investigations of this type have been tried and have failed or reasonably appear to be unlikely to succeed if they are tried."

2016 WL 7324987, at *5 (quoting Macfarlane Aff. ¶ 31).

13

Even in *Tippens*, despite finding the government's conduct to be outrageous, the court ultimately chose not to dismiss the indictment, concluding, *inter alia*, that the government had not encouraged the charged crimes, but had only provided the opportunity for those crimes to be committed, and that "reasonable minds can differ over the balance between the nature—and potential number—of the crimes charged and the necessity for the Governmental conduct, as reflected in the Government's justification for its conduct." *Tippens*, 16-CR-5110 (Govt. Mem., Ex. D), at *10.

Accordingly, the Court concludes that the FBI's two-week operation of the Playpen website does not constitute outrageous governmental conduct as to Defendant or third parties, so as to violate due process or warrant dismissal of the indictment against Defendant.

### C. *Chin* Does Not Warrant Dismissal of the Indictment

Given Defendant's heavy reliance on the Second Circuit's decision in *Chin*, the Court separately addresses his arguments based on that decision. As previously discussed, in *Chin*, the Second Circuit suggested that the government's encouragement or inducement of someone to commit a crime could constitute outrageous conduct on the basis that it violated the victim's rights. 934 F.2d at 399. However, at the same time, the panel made clear that, "[a] necessary prerequisite for demonstrating that an undercover investigation violated the rights of third parties is *proof* that the governmental action actually caused the defendant to commit a crime *that would otherwise not have been committed*." *Id*. at 400 (emphasis added); *see also Al Kassar*, 660 F.3d at 121 ("It does not suffice to show that the government created the *opportunity* for the offense, even if the government's ploy is elaborate and the engagement with the defendant is extensive") (emphasis added). Here, as in *Chin*, that proof is lacking.

As previously discussed, by the time the FBI took control of the Playpen website, it had been operating for at least six months and had at least 158,094 total members, 95,148 posts, 9,333 total topics, 1,500 unique users visiting the website daily, and over 11,000 unique users visiting weekly. (Macfarlane Aff. ¶¶ 11, 19.) During the two-week period when the FBI operated the website, the level of activity and number of users remained relatively unchanged.[16] There is nothing in the record—save a minor, but inconclusive, increase in the number of users during the two weeks the FBI controlled the website—that *proves* that the distribution of child pornography that occurred during those two weeks *would not otherwise have occurred*. Indeed, as defense counsel acknowledged at oral argument, the FBI's operation of the Playpen website, in reality, did not amount to the government *committing* or even *inducing* new crimes, but rather involved allowing *ongoing* criminal activity to *continue* for a two-week period while being monitored by

---

[16] In *Anzalone*, the court found, based on the government's data, that the number of Playpen users increased at most by 1,000 users—from 49,000 to 50,000—during the FBI's operation of the website. *See* 2016 WL 6476939, at *4 (comparing average number of Playpen users during two weeks before FBI takeover (49,000) and Playpen users during the two-week period under FBI control (50,000)). The court explained that the seeming exponential increase in users after the FBI took control of the website was due to fewer users logging in during the nascent stages of the website, which dragged down the average number of users for the first seven months. *Id.*

However, at oral argument, defense counsel asserted, without citing any factual support, that the FBI made the Playpen website run more efficiently, thereby increasing the amount of illegally distributed material. There appears to be a dispute on this issue. *Compare Anzalone*, 2016 WL 6476939, at *4 (finding that "the government did not take any action to improve upload and download speeds or otherwise enhance the site's functionality") *with Tippens*, 16-CR-5110 (Govt. Mem., Ex. D), at 8 (finding that "Government, in fact, improved [the Playpen website's] technical functionality"). In any event, even assuming *arguendo* that the FBI improved Playpen's functionality during the two-week period, the Court finds, for the reasons discussed *infra*, that this fact does not show that crimes were committed because of the FBI's operation of the Playpen website that otherwise would not have occurred.

the FBI.[17] Furthermore, the fact that the FBI did not use "spoofing" or other diversionary techniques to prevent the distribution of child pornography through the Playpen website, while under the FBI's control, does not prove that this distribution would not have otherwise occurred, given the vast number of websites that serve the same function as Playpen. Built into Defendant's argument is the counter-intuitive, and certainly unproven, assumption that Playpen users, once thwarted from accessing child pornography through that website, would simply give up and stop engaging in this conduct. Though Playpen might have been, as Defendant claims, one of the larger websites of this type, it certainly was not the only one, and there is no evidence upon which the Court can conclude that individuals interested in child pornography would have been so easily deterred from obtaining it by the shutting down of the Playpen website. (*See Michaud* Discovery Response, Def. Mem., Ex. B, at 7.) As the government explained in *Michaud*:

> To be sure, shutting down a facility such as [the Playpen website] would have prevented its unidentified users from continuing to post and disseminate child pornography through that website, but it would not prevent those users from continuing to unlawfully possess and disseminate child pornography by other means. [Playpen website] users engaged in that sort of activity before the FBI seized and shut down [the website], and those users who were not identified and apprehended undoubtedly continued to engage in that activity after [the website] was shut down, often through other online facilities. . . . There are currently child pornography bulletin boards operating on the Tor network that are similar in structure and function to [the Playpen website], that contain hundreds of thousands of user accounts, tens of thousands of postings, and which facilitate access to thousands of images and videos of child pornography.

---

[17] *See Owens*, 2016 WL 7079617, at *5 (emphasizing that "government did not create the Playpen website, and more importantly did not coerce [defendant] into receiving and possessing child pornography"); *Vortman*, 2016 WL 7324987, at **4–5 (finding that defendant's conduct was completely voluntary and "government merely attached itself to a child pornography operation that was already in full operation."); *Anzalone*, 2016 WL 6476939, at *5 (describing FBI's conduct as "operating Playpen for two weeks and permitting continued access to links to child pornography").

16

(*Id*. at 6.) Thus, Defendant has failed to show that the FBI's operation of the Playpen website resulted in the commission of child pornography crimes that otherwise would not been committed.

Furthermore, by focusing his due process argument on the overall criminal activity committed via the Playpen website, Defendant ignores the critical language in *Chin*, which indicates that the defendant must show that the government's conduct caused *the defendant*—and not just anyone—to commit crimes that otherwise would not have committed. *See Chin*, 934 F.3d at 400 ("A necessary prerequisite for demonstrating that an undercover investigation violated the rights of third parties is proof that the governmental action actually caused *the defendant* to commit a crime that would otherwise not have been committed.") (emphasis added). Here, Defendant plainly has not shown, nor does he even claim, that the FBI's two-week operation of the Playpen website caused him to commit the child pornography crimes of which he is accused and that he otherwise would not have committed these alleged crimes.[18] Indeed, according to the Complaint, Defendant registered his Playpen account on approximately November 14, 2014 and then actively logged onto the website for a total of two hours and 55 minutes between that date and March 3, 2015, when the site was shut down. (Dkt. 1, ¶ 5.) Thus, while *Chin,* in *dicta*, lends support to Defendant's due process challenge, the decision does not go as far as Defendant asserts in helping his argument, and if anything, creates a fatal flaw in Defendant's claim, to the extent that he does not—and perhaps cannot—show that the government's conduct caused him to commit child pornography crimes that he otherwise would not have committed.

---

[18] The Court, of course, recognizes that Defendant has not admitted, and is never required to admit, to engaging in any criminal conduct. However, this only further illustrates the problem Defendant faces in relying on *Chin*. The decision would only seem to benefit him if he pursues an entrapment defense and admits to the criminal conduct, but argues both that the government caused him to engage in alleged criminal conduct, and that he would not have committed the conduct but for the government's outrageous conduct.

## CONCLUSION

For all of the foregoing reasons, the Court denies Defendant's motion to dismiss the indictment based on his claim that the government's conduct in operating the Playpen website was outrageous and violated due process.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: January 27, 2017
Brooklyn, New York